## Case No. 15,210.

### UNITED STATES v. GIVEN.

[17 Int. Rev. Rec. 189.]

Circuit Court, D. Delaware. 1873.

#### CIVIL RIGHTS — CONSTITUTIONAL AMENDMENTS — VIOLATION BY STATE OFFICER.

1. The rights secured by the thirteenth, fourteenth, and fifteenth amendments to the constitution are objects of legitimate protection by the law-making power of the federal government, and the power is expressly conferred upon congress to enforce the articles conferring these rights. Earlier prohibitions to the states were left without any express power of interference by congress; but in this case such intervention was contemplated and expressly authorized.

2. When state laws have imposed duties upon persons, whether officers or not, the performance or non-performance of which affects rights under the federal government, congress may make the non-performance of those duties an offence against the United States, and may punish it accordingly.

[This was an indictment against Archibald Given for violation of Act May 31, 1870 (16 Stat. 140). There was a verdict of guilty, and the case is now heard upon motion in arrest of judgment.]

STRONG, Circuit Justice. The defendant was indicted for a violation of the second section of the act of congress of May 31, 1870, entitled "An act to enforce the right of citizens of the United States to vote in the several states of the Union, and for other purposes" (16 Stat. 140). That section enacts "that if by or under the authority of the constitution or laws of any state, or the laws of any territory, any act is or shall be required to be done as a prerequisite or qualification for voting, and, by such constitution or laws, persons or officers are or shall be charged with the performance of duties in furnishing to citizens an opportunity to perform such prerequisite, or to become qualified to vote; it shall be the duty of every such person and officer to give to all citizens of the United States the same and equal opportunity to perform such prerequisite, and to become qualified to vote, without distinction of race, color, or previous condition of servitude; and if any such person or officer shall refuse or knowingly omit to give full effect to this section, he shall for every such offence * * * be deemed guilty of a misdemeanor, and shall on conviction thereof be fined not less than five hundred dollars, or be imprisoned not less than one month, and not more than one year, or both, at the discretion of the court."

At the trial a verdict of guilty was returned upon five counts of the indictment, and it is now moved in arrest of judgment that "the statute under which the indictment was framed is unauthorized by the constitution of the United States, and is in conflict therewith."

The question thus presented is an impor-

tant one, and I have given to it a careful consideration. I agree that the legislative power of the federal government is not unlimited, and I accept the doctrine that congress can enact no law which is not authorized by the constitution, either expressly or by necessary implication. But within its sphere the power of congress is as ample and complete as the necessities for its exercise require. A power is shorn of none of its extent by the fact that it is held by a branch of the federal government. The powers of that government are limited in number, but not in their nature. If, therefore, the grant of power can be found in the constitution, the validity of a law enacted under it is not dependent upon the extent to which the exercise of the power has been carried. The thirteenth, fourteenth, and fifteenth amendments of the constitution have confessedly extended civil and political rights, and, I think, they have enlarged the powers of congress. The primary object of the thirteenth, and of the first sections of the fourteenth and fifteenth was to secure to persons certain rights which they had not previously possessed. Thus the thirteenth amendment made the right of personal liberty a constitutional right. The fourteenth assured the right of citizenship to all persons born or naturalized in the United States, and subject to the jurisdiction thereof. And the fifteenth defined partially that which constitutes citizenship and which belongs to citizenship as such. It recognizes, as a right of citizenship, exemption from disability on account of race, color, or previous condition of servitude, in the determination of a right to vote. It practically declares that citizenship, irrespective of color or race, confers a right to vote on equal terms or conditions with those that are required for voters of another race or color. It places white and colored persons on equal footing as respects the elective franchise, and it protects race against discrimination as fully as it protects color or previous condition. In all the states the right to vote at elections is held under certain restrictions. Among these it was not an uncommon one that the voter should be a free white citizen, or that he should not be of the African race. And until the amendment was adopted, it was in the power of any state to deny to any person who happened to be colored, or who happened to be of German or Irish descent, any participation in the elective franchise. Mere citizenship did not of course secure a right to vote. It was to remove the possibility of such discriminations that the fifteenth amendment was adopted. It leaves to the states, as before, the regulation of suffrage and of the qualification of electors within their limits, with the single restriction that they shall not make color, or race, or previous condition of servitude, a reason for discrimination. It is true the amendment is in form a prohibition upon the United States, and upon the states, but it is not the less on that account an as-

sertion of a constitutional right belonging to citizens as such. Surely it cannot be maintained that it conferred no rights upon persons. There are very many instances to be found in the constitution as it was before the recent amendments, in which rights of persons have been recognized and secured without any express grant. It is not uncommon to speak of them as existing, and to prohibit their infringement. The prohibition is itself an acknowledgment of the right. Thus, the provision that the privilege of the writ of habeas corpus shall not be suspended unless when in cases of rebellion or invasion the public safety may require it, is a constitutional recognition that such a privilege does exist. Indeed very many of the prohibitions mentioned in the 9th section, and those upon the states mentioned in the 10th section, imply corresponding rights and exemptions belonging to persons. It is not necessary to maintain that because there are constitutional rights, recognized as such by the organic laws, congress has power to protect them, in all cases, by affirmative legislation. Where rights result from prohibitions upon the states, there seems to have been no provision made for their enforcement by congress.

There is, however, one clause in the constitution that deserves particular mention, when speaking of indirect recognition of rights, and of the power of congress to protect them. I refer to the 2d section of article fourth, which ordained as follows: "No person held to service or labor in one state under the laws thereof, escaping into another, shall in consequence of any law or regulation therein be discharged from such service or labor, but shall be delivered up on claim of the party to whom such service or labor may be due." This has always been understood as securing the right of a master to the return of his fugitive servant. It gives no express power to congress to legislate upon the subject. And such power is not found in the 8th section of the first article, unless it is in the last clause, and there only by a very liberal construction. Yet by the act of February 12, 1793 [1 Stat. 302], congress enacted not only that the person to whom such rights were secured, the person to whom such labor or service might be due his agent or attorney, might seize such fugitive from labor, but that any person who should knowingly and willingly obstruct or hinder the seizure, or rescue the fugitive, or harbor him after notice that he was a fugitive from labor, should be subject to a penalty, as well as to damages. This act was held to be a constitutional exercise of congressional power by the supreme court, as well as by state courts, in repeated adjudications. Prigg v. Com. [16 Pet. (41 U. S.) 539]. So on the 18th of September, 1850 (9 Stat. 462), another act was passed, with much more stringent provisions intended to secure this right of the master, imposing severe penalties for obstructing or hindering the exercise of the

right, and fixing a minimum of damages to be recovered in a civil action. This second enactment has also been held constitutional by the supreme court of the United States. Ableman v. Booth, 21 How. [62 U. S.] 506. The discussion of this subject in Prigg v. Com. is worthy of careful attention, for it bears directly upon the question how far congress could, under the constitution, as it was before its recent amendments, interfere to protect rights recognized by it. I can only quote briefly from the opinion of the court as delivered by Judge Story, but the whole is important. The argument commences with some general observations upon the principles to be applied in expounding the constitution. "It will," said the court, "probably be found, when we look to the character of the constitution itself, the objects which it seeks to obtain, the powers which it confers, the rights which it secures, as well as the known historical fact that many of its provisions were matters of compromise of opposing interests and opinions, that no uniform rule of interpretation can be applied to it which may not allow, even if it does not positively demand, many modifications of its actual application to particular cases. And perhaps the safest rule of interpretation after all will be found to be, to look to the nature and effects of the particular powers, duties, and rights, with all the lights and aids of contemporary history, and to give to the words of each just such operation and force, consistent with their legitimate meaning, as may fairly secure and attain the end proposed." The court then proceeded to say: "Historically, it is well known that the object of this clause" (that respecting persons held to service or labor) was to secure the citizens of the slave-holding states the complete right and title of ownership in their slaves, as property, in every state of the Union into which they might escape from the state where they were held in servitude. "How, then," said the court, "are we to interpret the language of this clause? The true answer is, in such a manner, as consistently with the words, shall fully and completely effectuate the whole object of it. If, by one mode of interpretation, the right must become shadowy and unsubstantial and without any remedial power adequate to the end, and, by another mode, it will attain its just end, and secure its manifest purpose, it would seem, upon principles of reasoning, absolutely irresistible that the latter ought to prevail. No court of justice can be authorized so to construe any clause of the constitution as to defeat its obvious ends, when another construction, equally accordant with the words and sense thereof, will enforce and protect them." The court then proceeded to show that if congressional legislation was not contemplated, if it was not legitimate, the right secured by the provision would, in a great variety of cases, be delusive and empty. Hence it was argued, that, if the constitution guaranteed

the right, and required the delivery (as could not well be doubted), the natural inference was that the national government was clothed with the appropriate authority and functions to enforce it.

These principles reach much farther than is necessary to sustain the constitutionality of the 2d section of act of 1870. From the recognized existence of a constitutional right, and a duty not imposed in terms upon congress, power was deduced to protect the right by penal legislation. Said Chief Justice Taney: "I concur in all that is contained in the opinion concerning the power of congress to protect the citizens of the slave-holding states in the enjoyment of this right, and to provide by laws an effectual remedy to enforce it, and to inflict penalties upon those who shall violate its provisions." Thus it will be seen that the end to be secured was regarded as measuring the extent of the power existing to secure it. I am not, however, to be understood as holding that under the constitution, as it was prior to the recent amendments, all the rights therein recognized, or all of the duties enjoined, might have been protected and enforced by congressional legislation. Some, at least, if not all of the prohibitions upon the states, which imply personal rights, were left for enforcement to the federal judiciary, or to the comity and sense of right of the states themselves.

But the recent amendments have introduced great changes. If prior to 1870, when the fifteenth amendment became a part of our organic law, the right of a slave holder to the ownership of his fugitive slave in any state of the Union, and his right to delivery of such slave, was a right which congress was authorized to enforce and protect by penal legislation against individuals obstructing it, much more are the rights secured, recognized, and guaranteed by the thirteenth, fourteenth, and fifteenth amendments objects of legitimate protection by the law-making power of the federal government. Those amendments have left nothing to the comity of the states affecting the subjects of their provisions. They manifestly intended to secure the right guaranteed by them against any infringement from any quarter. Not only were the rights given—the right of liberty, the right of citizenship, and the right to participate with others in voting, on equal terms, without any discrimination on account of race, color, or previous condition of servitude—but power was expressly conferred upon congress to enforce the articles conferring the right. The second section of the fifteenth article ordained that "the congress shall have power to enforce this article by appropriate legislation." Manifestly this section was adopted for a purpose. It must be so construed as to confer some effective power. But what meaning can it have if the first section, as contended by the defendant, is no more than an inhibition upon the United States, and upon the

states as sovereignties, against discriminations? If the first section assures no rights to persons, how can congress enforce the article? Proprio vigore, the first section renders inoperative all adverse national or state legislation. To hold, therefore, that the second section was adopted merely to guard against national or state enactments, or to afford protection against ministerial or judicial acts of state governments, or of state officers acting in the line of their duty prescribed by a state, is to make superfluous and unmeaning all that was accomplished by the first section. And thus holding is to lose sight of the end sought to be attained by both sections, namely, the right to exemption from certain unfriendly discriminations. It is to subordinate that which is substance to mere form. I cannot think that such is a reasonable construction of this amendment. It was well known when it was adopted that in many quarters it was regarded with great disfavor. It might well have been anticipated that it would meet with evasion and hindrances, not from state legislatures, for their affirmative action was rendered powerless by it, or not from a state's judiciary, for their judgments denying the right were reviewable by federal courts, but by private persons and ministerial officers, by assessors, collectors, boards of registration, or election officers. And it might have been foreseen that by these agencies a right intended to be substantial could become incapable of enjoyment. Suppose, as is largely the case in Delaware, the state passes no unfriendly act, but neglects to impose penalties upon its election officers for making discriminations on account of race or color, and provides no remedy for such wrongs, of what value is the constitutional provision unless it means that congress may interfere? I think such intervention was contemplated and expressly authorized. It was not intended to leave the right without full and adequate protection. Earlier prohibitions to the states were left without any express power of interference by congress; but these later, encountering as they did so much popular prejudice and working changes so radical, were fortified by grants to congress of power to carry them into full effect —that is, to enact any laws appropriate to give reality to the rights declared. That the second section of the act of May 31, 1870, is appropriate legislation to secure those rights and to give effect to the thirteenth amendment is perfectly plain. I am therefore of opinion that its enactment was within the power of congress. The first reason urged in arrest of the judgment cannot be sustained.

The second reason assigned in support of the motion is "that the provisions of the act of congress are not applicable to the duties imposed by the laws of Delaware upon the defendant, as charged in the indictment." I understand this to mean that the defendant is not a person or officer charged by the law of the state with the performance of duties in furnishing to citizens an opportunity to qualify themselves for voting, or to perform some prerequisite thereto. To determine how this is requires an examination of the state constitution and laws. By the constitution several things are required as prerequisites to the enjoyment of a right to vote. Among these is the payment of a county tax within two years next prior to the election day, which tax had been assessed at least six months before the election. To enable the performance of this prerequisite the law of the state makes provision for an annual assessment of a tax, and for the appointment of a collector to receive it. The defendant is such a tax collector, and his duties as such are clearly defined by law. He is required to collect all the rates and taxes mentioned in his duplicate, and pay over the same, except so far as allowances may be made to him by the levy court for delinquencies, commissions, or otherwise. He is required to return to the levy court, on the first Tuesday of March next after the date of his warrant, a true account of all delinquents. If then an allowance be made to him for the tax of any one returned delinquent, the tax is extinguished, and he is not permitted to receive it. With the levy court is the power of making the assessment lists, but no assessment can be made after the last day of March; nor can any alterations be made in the assessment list after that time. From the assessment list the collector's duplicate is made. The levy court is required at its March meeting to examine and settle the delinquent list of each collector, and strike the name of each delinquent from the assessment list, and the collector's duplicate, if the delinquent be dead, or has removed from the state; otherwise it is to remain upon the assessment, and be entered on the collector's duplicate for the ensuing year. These are all duties imposed by the statutes. In view of them, it is very plain that a tax collector is a person charged by the laws of the state with the performance of duties in furnishing to citizens an opportunity to qualify themselves for voting. He, and he alone, can receive the tax which must be paid before a vote can be given. He makes the return of delinquents, and if that return be false, or if he return the delinquent dead, or removed from the state, thereby causing his name to be stricken from the assessment list, there can be no assessed tax the payment of which is by the constitution a prerequisite for voting. A false return is a breach of the duty with which he is charged, leading directly to the disqualification of the voter. If such a return be made, or if the collector refuse or omit to collect the tax, and if this is done because of the race, color, or previous condition of servitude of any citizens, and with a purpose to make a discrimination against him, I have no doubt that the

collector is within the purview of the act of congress. I think, therefore, the indictment is not faulty in this particular.

The remaining reason advanced in support of the motion in arrest of judgment is "that the defendant, being an officer of the state of Delaware, with no powers or duties but such as were prescribed by the constitution and laws of said state, is amenable only to said constitution and laws for any non-performance thereunder." If, by this is meant that a state officer, or a person deputed to perform duties on behalf of a state, is not amenable to the laws of the United States, that he owes no duties to such laws, and that he is not punishable for violation of them, I cannot assent to it. I agree that congress cannot impose upon state officers, as such, federal duties, but I fail to perceive that the act of 1870 has imposed any new duties upon any state officer. It is, I think, an exploded heresy that the national government cannot reach all individuals in the states. It cannot invade the state domain. It cannot take cognizance of offences against state sovereignty. But when state laws have imposed duties upon persons, whether officers or not, the performance or non-performance of which affects rights under the federal government (as, for example, to vote, the right of citizenship, or the right to vote, so far as it is secured), I have no doubt that congress may make the non-performance of those duties an offence against the United States, and may punish it accordingly. This is not invading the state domain. It has no reference to violations of state laws. They remain punishable in the state courts. Undoubtedly, an act, or an omission to act, may be an offence both against the state law and the laws of the United States. Any other doctrine would place the national government entirely within the power of the states, and would leave constitutional rights guarded only by the protection which each state might choose to extend to them. The fault of this objection to the indictment is, it fails to apprehend that the fifteenth amendment secured rights to every citizen, and that it gave congress power to protect them. It may be that congress cannot provide for the appointment of assessors, registers, or collectors, or for the existence of any officers who under state constitutions are necessary to enable persons to qualify for voting; but if they cannot, when such officers are appointed, provide that no constitutional discriminations shall be made, the thirteenth amendment is not worth the paper upon which it was written. I cannot construe the constitution in such a manner as to give it no effect. I am therefore constrained to hold that there is no sufficient reason for arresting the judgment in this case.

The motion in arrest of judgment is overruled.

An opinion was also delivered in this case by Bradford, District Judge, for which see [Case No. 15,211.]